## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE WILLIAM B FEDERMAN IRREVOCABLE TRUST, derivatively on behalf of BUMBLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> ANN MATHER, WHITNEY WOLFE HERD, PAMELA A. THOMAS-GRAHAM, ELISA A. STEELE, MATTHEW S. BROMBERG, R. LYNN ATCHISON, AMY M. GRIFFIN, JENNIFER B. MORGAN, SACHIN J. BAVISHI, CHRISTINE L. ANDERSON, AND JONATHAN C. KORNGOLD, <br><br> Defendants, <br><br> and <br><br> BUMBLE INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY DEMAND** |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff, The William B. Federman Irrevocable Trust ("Plaintiff"), by its undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint. Plaintiff alleges the following upon personal knowledge with respect to itself and, as to all other matters, upon an investigation undertaken by Plaintiff's counsel, which included a review of (i) public filings with the U.S. Securities and Exchange Commission (the "SEC") by nominal defendant Bumble Inc. ("Bumble" or the "Company"), (ii) wire and press releases by the Company, news reports, analyst reports and advisories about the Company, (iii) pleadings and other documents filed in lawsuits against the Company and certain of its executive officers and directors, including the securities class action filed in the United States District Court for the Southern District of New York captioned *UA Local 13 Pension Fund v. Bumble Inc., et. al.*, Case No. 1:22-cv-00624 (the

"Securities Class Action"), which alleges violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, in connection with the Company's secondary public stock offering which took place on or about September 10, 2021 (the "SPO"); and (iv) other publicly available information concerning the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Bumble against the members of its Board of Directors (the "Board") for breaches of fiduciary duty and violations of the federal securities laws that resulted in material damage to the Company and its stockholders.

2.      Bumble is controlled by the investment advisory firm The Blackstone Group Inc. and affiliated investment funds (collectively, "Blackstone") and its Chief Executive Officer ("CEO") and director Defendant Whitney Wolfe Herd ("Herd").

3.      In February 2021, Blackstone took Bumble public through an initial public offering ("IPO") in which the Company raised more than $2.4 billion from investors in gross offering proceeds.

4.      Following its IPO, Bumble reported significant growth in its paying user count. However, during the third quarter of 2021, the Company's previously reported paying user growth trend had abruptly reversed.

5.      In fact, Bumble had significantly increased pricing on the Bumble app during the third quarter, diminishing the number of users willing to enter into paid memberships for the app. In addition, Bumble temporarily disabled third-party payment options on Android for the Badoo

app as Bumble prepared to move payments to its platform, materially impacting the Company's paying user growth and revenue collection.

6. In September 2021, just a few weeks before the end of the third quarter, Blackstone cashed out a substantial portion of its Bumble investment, causing Bumble to undertake a secondary public offering ("SPO") of shares. The SPO differed significantly from the IPO in that Bumble did not raise any capital or sell any shares. Instead, the SPO's sole purpose was to enrich controlling stockholder Blackstone by allowing it to sell 20.7 million shares of Bumble Class A common stock at $54 per share, generating more than $1.1 billion in gross proceeds.

7. After the SPO, Blackstone and the other principal stockholders of the Company, including Defendant Herd, remained firmly in control of Bumble. The SPO offering documents expressly state that "[i]mmediately following this offering, our Principal Stockholders will hold 93% of the voting power in Bumble Inc." In fact, Blackstone, Defendant Herd, and certain other pre-IPO investors hold "Common Units"[1] that entitle them to ten votes per unit, as opposed to the single vote entitled to each holder of a share of Class A common stock.

8. In the prospectus and registration statement for the SPO, Bumble and the Individual Defendants repeatedly touted the Company's financial condition and business prospects, based upon its history of increasing the number of users paying for the Bumble app, which accounts for a substantial portion of the Company's income.[2] The Company made no mention of the reversal of this trend experienced in the third quarter of 2021, during the closing weeks of which the SPO

---

[1] According to Bumble's 2022 Proxy Statement, "Common Units" refers to a class of limited partnership interests that was created when certain outstanding units were reclassified at the time of Bumble's IPO.

[2] According to the Company's Quarterly Report filed with the SEC on May 16, 2022, Bumble had 3 million paying users from the Bumble and Badoo apps contributing more than $68 million to the Company's revenue, amounting to approximately 32% of the Company's overall revenue.

was conducted.  Likewise, no disclosure was made of the problems plaguing Bumble's dating apps.

9.      On November 10, 2021, Bumble publicly reported its paying user growth trends reversed in the third quarter and that the Company's total paying user count had actually declined. As a result of these disclosures, Bumble stock spiraled downward, ultimately dropping by more than 50% from the SPO price.  In the wake of this spiraling stock price, a securities fraud class action was filed against Bumble, the Individual Defendants, and the underwriters for the SPO, including Blackstone.  As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, its directors, and officers, and the underwriters for the SPO.

10.     Since the Individual Defendants are neither disinterested nor independent, the making of a demand upon them would be futile and thus is excused.  In the absence of this action, Bumble will neither recover its damages nor properly remediate its internal control weaknesses.

<u>**JURISDICTION AND VENUE**</u>

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §77v because Plaintiff's claims raise a federal question under Section 11 of the Securities Act of 1933, 15 U.S.C. § 11.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     The Court has jurisdiction over each Defendant.  Bumble, Inc. does business in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers and/or directors of Bumble, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.    This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

15.    In addition, the Amended and Restated Certificate of Incorporation of Bumble Inc. includes an exclusive forum selection clause which states: "Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by applicable law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the federal securities laws of the United States of America, including, in each case, the applicable rules and regulations promulgated thereunder."

## PARTIES

### A.    Plaintiff

16.    The William B. Federman Irrevocable Trust purchased Bumble stock on the day of the Company's IPO and has held Bumble stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.    Nominal Defendant

17.    Nominal defendant Bumble is a company duly incorporated under the laws of the State of Delaware.  Its principal executive offices are located at 1105 West 41st Street, Austin Texas.  Bumble's common stock trades on the Nasdaq Stock Market under the symbol "BMBL." Bumble operates three dating apps: Bumble, Badoo, and Fruitz.  Bumble is a "controlled" company

because a majority of the voting power in the Company is held by Blackstone and the Company's

CEO and founder, Defendant Herd.[3]

### C.    **Individual Defendants**

18.    Defendant Herd is the Founder, CEO, and a director of Bumble.  Herd is one of the

"Principal Stockholders" of Bumble pursuant to a Stockholders Agreement among Herd and

certain affiliates of Blackstone.

19.    Defendant Herd has served as a director and CEO since January 2020.  As of April

11, 2022, Herd held 604,650 shares of Class A common stock and 25,000,817 Common Units.

20.    During the relevant time period, Bumble paid Herd the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2021 | $650,000 | N/A | N/A | $463,500 | $11,700 | $1,125,200 |
| 2020 | $637,500 | N/A | $18,642,249 | $407,296 | N/A | $19,687,045 |

21.    In January 2020, Bumble entered into a loan and security agreement with Beehive

Holdings III, LP ("Beehive"), a Delaware limited partnership controlled by Herd, pursuant to

which Bumble loaned Beehive $119 million.

22.    Defendant Christine L. Anderson ("Anderson") has served as a Bumble director

since August 2020.  Anderson is a Senior Managing Director and the Global Head of External

Relations at Blackstone.  Anderson oversees Blackstone's external and internal communications,

brand strategy, marketing, and Environmental Social Governance functions.

---

[3]    According to the Company's latest Proxy Statement filed with the SEC on April 22, 2022, Blackstone and Herd control 92.2% of the voting power.

23.    Defendant R. Lynn Atchison ("Atchison") has served as a Bumble director since October 2020 and is Chair of the Audit and Risk Committee.  As of April 11, 2022, Atchison held 2,680 Common Units and 87,915 Incentive Units[4], of which 11,989 had vested.

24.    During the time period relevant herein, Bumble paid Atchison the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $75,000 | N/A | N/A | N/A | $75,000 |
| 2020 | $13,115[5] | N/A | $719,615 | N/A | $732,730 |

25.    Defendant Sachin J. Bavishi ("Bavishi") has been a Bumble director since January 2020.  Bavishi is a managing director in Blackstone's Private Equity Group.

26.    Defendant Matthew S. Bromberg ("Bromberg") has been a Bumble director since July 2020.  As of April 11, 2022, Bromberg held 6,524 Common Units and 87,915 Incentive Units, of which 11,989 have vested.

27.    During the time-period relevant herein, Bumble paid Bromberg the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $75,000 | N/A | N/A | N/A | $75,000 |
| 2020 | $37,705[6] | N/A | $776,857 | N/A | $814,562 |

---

[4]    According to the 2022 Proxy: "The Incentive Units are 'profit interests' having economic characteristics similar to stock appreciation rights and having the right to share in any equity value of Bumble Holdings above specified participation thresholds.  Vested Incentive Units may be converted to Common Units and be subsequently exchanged for shares of Class A common stock."

[5]    Defendant Atchison was entitled to an annual cash retainer in the amount of $75,000, payable quarterly in arrears, pro-rated, for her period of service during the 2020 fiscal year.

[6]    Defendant Bromberg was entitled to an annual cash retainer in the amount of $75,000, payable quarterly in arrears, pro-rated, for her period of service during the 2020 fiscal year.

28.    Defendant Amy M. Griffin ("Griffin") has been a Bumble director since February 2021.  As of April 11, 2022, Defendant Griffin held 152,700 shares of Class A common stock and 99,904 Incentive Units, of which none have vested.

29.    During the time period relevant herein, Bumble paid Griffin the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $66,667 | N/A | 1,159,335 | N/A | $1,226,002 |
| 2020 | $37,705[7] | N/A | $776,857 | N/A | $814,562 |

30.    Defendant Jonathan C. Korngold ("Korngold") has been a Bumble director since January 2020.  Korngold is a member of the Compensation Committee.  Korngold is a Senior Managing Director and Global Head of Blackstone's Growth Equity Business. According to Bumble's 2022 Proxy Statement, Korngold is independent.   Korngold has received no compensation from Bumble for his service on the Board.

31.    Defendant Ann Mather ("Mather") has been a Bumble director since March 2020. Mather is the Chair of the Board and Chair of the Nominating and Corporate Governance Committee.  As of April 11, 2022, Mather held 52,197 Common Units.

32.    During the time-period relevant herein, Bumble paid Mather the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $300,000 | N/A | N/A | N/A | $300,000 |
| 2020 | $244,262 | N/A | $1,177,552 | N/A | $1,421,814 |

---

[7]    Defendant Griffin was entitled to an annual cash retainer in the amount of $75,000, payable quarterly in arrears, pro-rated, for her period of service during the 2020 fiscal year.

33.    Defendant Jennifer B. Morgan ("Morgan") has been a Bumble director since February 2021 and is a member of the Nominating and Corporate Governance Committee. Morgan is the Global Head of Portfolio Transformation and Talent at Blackstone.

34.    Defendant Elisa A. Steele ("Steele") has been a Bumble director since July 2020. Steele is Chair of the Compensation Committee, a member of the Audit and Risk Committee, and a member of the Nominating and Corporate Governance Committee. According to Bumble's 2022 Proxy Statement, Steele is independent. As of April 11, 2022, Steele held 9,125 shares of Class A common stock and 87,915 Incentive Units, of which none has vested.

35.    During the time period relevant herein, Bumble paid Steele the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $75,000 | N/A | N/A | N/A | $75,000 |
| 2020 | $37,705[8] | N/A | $776,857 | N/A | $814,562 |

36.    Defendant Pamela A. Thomas-Graham ("Thomas-Graham") has been a Bumble director since August 2020 and is a member of the Compensation Committee and the Audit and Risk Committee. As of April 11, 2022, she held 6,535 shares of Class A common stock, 5,886 Common Units, and 87,915 Incentive Units, of which 11,989 have vested.

---

[8]    Defendant Elisa A. Steele was entitled to an annual cash retainer in the amount of $75,000, payable quarterly in arrears, pro-rated, for her period of service during the 2020 fiscal year.

37.     During the time period relevant herein, Bumble paid Thomas-Graham the following compensation:

| Fiscal Year | (Salary) Fees Earned or Paid in Cash | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|---|---|---|---|---|---|
| 2021 | $75,000 | N/A | N/A | N/A | $75,000 |
| 2020 | $30,943[9] | N/A | $678,728[10] | N/A | $709,671 |

## THE INDIVIDUAL DEFENDANTS' DUTIES

38.     By reason of their positions as officers, directors, and/or fiduciaries of Bumble, and because of their ability to control the business and corporate affairs of Bumble, the Individual Defendants owed, and owe, the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Bumble in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Bumble and its stockholders to benefit all stockholders equally, and not in furtherance of their personal interests or benefits.

39.     Each director and officer of the Company owed, and owes, Bumble and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

---

[9]     Defendant Thomas-Graham was entitled to an annual cash retainer in the amount of $75,000, payable quarterly in arrears, pro-rated, for her period of service during the 2020 fiscal year.

[10]    As of December 31, 2020, Steele held 1,362,907 Class B units, for which they received 99,904 Incentive Units in the Reclassification.

40.     To discharge their duties, the officers and directors of Bumble were, and are, required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.

41.     At all times relevant hereto, the Individual Defendants were the agents of each other and Bumble and were always acting within the course and scope of such agency.

42.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Bumble.

### ADDITIONAL DUTIES UNDER THE CODE OF CONDUCT

43.     Bumble's Code of Conduct applies to "every director, officer, and employee."

44.     In her introduction to the Code of Conduct, Defendant Herd emphasizes the need to "act with integrity and speak up when you suspect we're not living up to that mark."

45.     The Code of Conduct stresses honest and ethical behavior stating that "[o]ur Code helps make sure our actions are ethical and legal.  Beyond that, it helps us do what's right for our employees, our user base, our stockholders, and our communities."

46.     The Code of Conduct states the importance of "winning business through the confidence and trust that our people, products, and services inspire, and the superior value we provide."

47.     In a section titled "Accurate Records," the Code of Conduct states:

We maintain complete and accurate records so that we can make responsible business decisions and provide full, fair, accurate, timely, and understandable disclosure in reports and documents Bumble submits to the Securities and Exchange Commission and other government agencies and in other public communications.

\*   \*   \*

Bumble depends on proper records for making strategic and informed decisions, building trust with stockholders and users, and complying with and enforcing the law. As a public company, securities laws require Bumble to maintain our records

accurately and to disclose full information about our business and financial performance in a timely manner.

48.    The Code of Conduct describes the process of maintaining "the integrity of our books and records by:"

- Complying with generally accepted accounting principles, internal controls, and all relevant laws and regulations;

- Recording all assets, liabilities, revenues, expenses, and business transactions completely, accurately, in the proper period, and in a timely manner;

- Ensuring that records are submitted to internal and external auditors promptly and accurately;

- Never misleading or misinforming anyone about our business operations or finances; and

- Reporting any concern that a record is inaccurate, false, or misleading to the Audit Committee.

49.    The Code of Conduct details the importance of maintaining proper internal controls:

Internal controls and procedures are in place to protect Bumble, our stockholders, our users, and others. They have been established to reduce risks to our business, and especially to prevent fraud, uncover and minimize errors, promote operating efficiency, and achieve compliance with our policies and the law.

## ADDITIONAL DUTIES OF SENIOR FINANCIAL OFFICERS

50.    In addition to the Code of Conduct and associated policies, Bumble's Senior Financial Officers, which includes the CEO and the President of Bumble, are required to comply with the Supplemental Code of Ethics ("Supplemental Code"), "the purpose of which is to promote honest and ethical conduct and compliance with applicable law, particularly as related to the maintenance of the Company's financial books and records and the preparation of its financial statements."

51.     Pursuant to the Supplemental Code, Senior Financial Officers, such as Defendant Herd, are required to:

- engage in and promote ethical conduct;

- carry out their responsibilities honestly, in good faith and with integrity, due care and diligence, exercising at all times their best independent judgment;

- assist in the production of full, fair, accurate, and timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and other regulators and in other public communications made by the Company;

- comply with applicable laws, rules, and regulations; and

- promptly bring to the attention of the Chief Legal Officer any violation of the Code of Conduct or this Supplemental Code.

52.     The Supplemental code continues:

Each Senior Financial Officer will be held accountable for adherence to the Supplemental Code and the Audit Committee shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Supplemental Code by a Senior Financial Officer, up to and including termination. Violations of this Supplemental Code may also constitute violations of law which may subject a Senior Financial Officer and the Company to criminal and civil penalties.

## ADDITIONAL DUTIES OF THE AUDIT AND RISK COMMITTEE

53.     The members of the Company's Audit and Risk Committee (Chairperson Atchison, Steele, and Thomas Graham) have additional duties outlined in the Audit and Risk Committee Charter, including requirements that its members oversee:

- The quality and integrity of the Company's financial statements, as well as oversight of the Company's accounting and financial reporting processes and financial statement audits;

- The effectiveness of the Company's control environment, including internal controls over financial reporting;

- The Company's compliance with legal and regulatory requirements

applicable to financial statements and accounting and financial reporting processes; and

- The effectiveness of the Company's risk management processes, particularly with respect to financial risk exposure.

## ADDITIONAL DUTIES OF THE NOMINATING AND CORPORATE GOVERNANCE COMMITTEE

54.     In addition to the fiduciary duties described above, the Nominating and Corporate Governance Committee's Charter requires its members (Chairman Mather, Morgan, and Steele) to review and assess the adequacy of Bumble's corporate governance guidelines and recommend proposed changes to the Board.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

55.     Defendant Bumble is an operator of three online dating platforms: the Bumble app, the Badoo app, and the Fruitz app.  The Bumble app, launched in 2014, is a popular dating app in the United States, the United Kingdom, Australia, and Canada.  The Badoo app, launched in 2006, is popular in Europe and Latin America and was available in 73 countries as of July 31, 2021.  The Fruitz app, which is popular in Europe, was purchased by Bumble in February 2022.

56.     Bumble's apps offer both free and paid, or "Premium," accounts.  While all members have access to certain aspects of the dating apps, Premium members pay subscription fees and additional fees for certain "Premium Services" that purportedly enhance members' experiences on the apps.  Selling Premium memberships to "paying users" is how Bumble monetizes its apps.  Because Bumble is not currently profitable, it is critically important to investors that Bumble continue to grow its paying user base so that the Company can eventually become profitable.

57.    Prior to 2019, the Bumble and Badoo apps were owned by MagicLab. In 2019, Blackstone acquired a majority stake in MagicLab at a reported valuation of $3 billion.[11] Under the terms of the deal, Russian billionaire Andrey Andreev, the founder of MagicLab, sold his stake to Blackstone and was replaced as chief executive by Whitney Wolfe Herd, Bumble's Founder and CEO.[12]

58.    As a result of the acquisition, Blackstone became the controlling stockholder of Bumble.

**B.    Bumble's IPO**

59.    On October 30, 2020, Bumble filed with the SEC a draft registration statement on Form S-1 relating to the offering of shares of Class A common stock. Bumble launched its IPO on February 11, 2021. After multiple amendments, Bumble filed with the SEC a final prospectus for the offering of 50,000,000 Bumble Class A shares on February 12, 2021 (with the registration statement, the "IPO Registration Statement").

**1.    The Bumble Principal Stockholders Agreement**

60.    In connection with the IPO, on February 10, 2021, Bumble, Inc., Blackstone, Accel, and certain related entities entered into a Stockholders Agreement. The Stockholders Agreement provides the signatories (Bumble's "Principal Stockholders") with outsized voting rights. Specifically, the Stockholders Agreement provides that, until seven years from the closing of the IPO (or, if earlier, the date the parties to the Stockholders Agreement cease to own in the aggregate 7.5% of the outstanding shares of Class A common stock), each share of Class A common stock

---

[11]    Venture capital group Accel Partners ("Accel") also invested $100 million.

[12]    Angel Au-Yeung, *Blackstone to Buy Russian Billionaire's Bumble Stake after Forbes Investigation into His Companies, Forbes,* Nov. 8, 2019, https://www.forbes.com/sites/angelauyeung/2019/11/08/blackstone-to-buy-russian-billionaires-majority-stake-in-owner-of-dating-app-bumble/?sh=4a6a9be546a8.

held by a Principal Stockholder will entitle the Principal Stockholder to ten votes and each Principal Stockholder that holds Class B common stock[13] will be entitled, without regard to the number of shares of Class B common stock held by such Principal Stockholder, to a number of votes equal to ten times the aggregate number of Common Units (including Common Units issued upon conversion of vested Incentive Units) of Bumble Holdings held by such Principal Stockholder.

61.     With respect to the election of directors, the Stockholders Agreement provides, in relevant part:

2.1 Election of Directors.

(a) ***Following the Closing Date, [Blackstone] shall have the right. . . to designate . . . a number of individuals[14]*** such that . . . the number of Blackstone Designees . . . serving as Directors of the Company will be equal to:

> (i) if the Blackstone Investors, the Accel Investor and their Affiliates collectively Beneficially Own 50% or more of the Total Outstanding Securities as of the record date for such meeting, the lowest whole number that is greater than 50% of the Total Number of Directors;

> (ii) if the Blackstone Investors, the Accel Investor and their Affiliates collectively Beneficially Own at least 40% (but less than 50%) of the Total Outstanding Securities as of the record date for such meeting, the lowest whole number that is greater than 40% of the Total Number of Directors;

> (iii) if the Blackstone Investors, the Accel Investor and their Affiliates collectively Beneficially Own at least 30% (but less than 40%) of the Total Outstanding Securities as of the record date for such meeting, the lowest whole number that is greater than 30% of the Total Number of Directors;

> (iv) if the Blackstone Investors, the Accel Investor and their Affiliates collectively Beneficially Own at least 20% (but less than 30%) of the Total Outstanding Securities as of the record date for such meeting, the lowest

---

[13]     Class B shares, issued pre-IPO, have no economic rights but entitle the holder, without regard to the number of shares of Class B common stock held by such holder, to a number of votes that is equal to the aggregate number of Units of Bumble Holdings held by the holder on all matters on which stockholders of Bumble Inc. are entitled to vote generally.

[14]     Unless otherwise indicated, emphasis is added.

whole number that is greater than 20% of the Total Number of Directors; and

(v) if the Blackstone Investors, the Accel Investor and their Affiliates collectively Beneficially Own at least 5% (but less than 20%) of the Total Outstanding Securities as of the record date for such meeting, the lowest whole number (such number always being equal to or greater than one) that is greater than 10% of the Total Number of Directors (in each case, each such person a "Blackstone Designee"). For so long as the Directors on the Board are divided into three classes, such Blackstone Designees shall be apportioned among such classes so as to maintain the number of Blackstone Designees in each class as nearly equal as possible.

(b) *The Founder Investor shall, from and after the date hereof, be entitled to designate one Director to the Board* (such person, the "Founder Designee") for so long as the Founder Investor Beneficially Owns at least 50% of the Common Units Beneficially Owned by the Founder Investor as of the closing of the Sponsor Acquisition (as appropriately adjusted for any stock split, stock dividend, combination, reclassification, recapitalization, merger, consolidation, exchange or the like and including for this purposes any shares of Class A common stock acquired by the Founder Investor in exchange for Common Units pursuant to the Exchange Agreement).

(c) *For so long as the Blackstone Investors, the Accel Investor and their Affiliates Beneficially Own at least 5% of the Total Outstanding Securities, the Blackstone Designator may also designate one non-voting observer to attend meetings of the Board*. . . .

(d) If at any time any of the Blackstone Designator or the Founder Investor (collectively, the "Principal Stockholder Designators", and each a "Principal Stockholder Designator") has designated fewer than the total number of individuals that it is then entitled to designate pursuant to Section 2.1(a) or 2.1(b) hereof, the Blackstone Investors or the Founder Investor, as applicable, shall have the right, at any time and from time to time, to designate such additional individuals which is entitled to so designate, in which case, any individuals nominated by or at the direction of the Board or any duly-authorized committee thereof for election as Directors to fill any vacancy on the Board shall include such designees, and *the Company shall use its best efforts to (i) effect the election of such additional designees, whether by increasing the size of the Board or otherwise, and (ii) cause the election of such additional designees to fill any such newly-created vacancies or to fill any other existing vacancies*.

(e) Directors are subject to removal pursuant to the applicable provisions of the Amended and Restated Certificate of Incorporation of the Company; *provided*, *however*, for as long as this Agreement remains in effect, *the Blackstone Designees may only be removed with the consent of the Blackstone Designator and the Founder Designee may only be removed with the consent of the Founder*

17

*Investor*, in each case delivered in accordance with Section 5.13 hereof.

\* \* \*

(g) The Company shall, to the fullest extent permitted by law, include in the slate of nominees recommended by the Board at any meeting of stockholders called for the purpose of electing directors (or consent in lieu of meeting), the persons designated pursuant to this Section 2.1 and *use its best efforts to cause the election of each such designee to the Board, including nominating each such individual to be elected as a Director as provided herein, recommending such individual's election and soliciting proxies or consents in favor thereof. In the event that any Principal Stockholder Designee shall fail to be elected to the Board at any meeting of stockholders called for the purpose of electing directors (or consent in lieu of meeting), the Company shall use its best efforts to cause such Principal Stockholder Designee (or a new designee of the applicable Principal Stockholder Designator) to be elected to the Board, as soon as possible, and the Company shall take or cause to be taken, to the fullest extent permitted by law, at any time and from time to time, all actions necessary to accomplish the same, including, without limitation, actions to effect an increase in the Total Number of Directors*.

62.    Thus, under the terms of the Stockholders Agreement, which remains in place, the Principal Stockholders are firmly in control of the Company, shareholder voting, and the composition of the Board.    Accordingly, Bumble is subject to the "Controlled Company Exception":

In connection with our IPO, our Principal Stockholders entered into a stockholders agreement, described in "Transactions with Related Persons," and beneficially own approximately 92% of the combined voting power of our Class A and Class B common stock. As a result, we are a "controlled company" within the meaning of the Nasdaq corporate governance standards. Under these corporate governance standards, a company of which more than 50% of the voting power is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance standards, including the requirements (1) that a majority of our Board of Directors consist of independent directors, (2) that our Board of Directors have a compensation committee that consists entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (3) that our director nominations be made, or recommended to our full Board of Directors, by our independent directors or by a nominations committee that consists entirely of independent directors and that we adopt a written charter or Board resolution addressing the nominations process. Although we are not relying on the exemptions from these corporate governance requirements, if we do rely on such exemptions in the future, our stockholders will not have the same protections afforded to stockholders of companies that are subject to these corporate governance requirements. In the event that we cease to

be a "controlled company" and our shares continue to be listed on Nasdaq, we will be required to comply with these provisions within the applicable transition periods.

## 2.    The IPO Registration Statement

63.    The IPO Registration Statement disclosed that, after the completion of the offering, Defendant Herd and Blackstone would "continue to own a majority of the voting power of shares eligible to vote in the election of our directors."   Specifically, the IPO Registration Statement stated:

> In general, holders of shares of our Class A common stock are entitled to one vote for each share of Class A common stock held of record on all matters on which stockholders are entitled to vote generally. Each holder of Class B common stock shall generally be entitled, without regard to the number of shares of Class B common stock held by such holder, to one vote for each Common Unit (as defined herein) of Buzz Holdings L.P., a Delaware limited partnership ("Bumble Holdings") held by such holder on all matters on which stockholders of Bumble Inc. are entitled to vote generally. ***Notwithstanding the foregoing, unless they elect otherwise, each of Whitney Wolfe Herd, the founder of Bumble (our "Founder") and affiliates of The Blackstone Group Inc. ("Blackstone" or "our Sponsor"), to whom we refer collectively as our "Principal Stockholders," will be entitled to outsized voting rights as follows.*** Until seven years from the closing of this offering (or, if earlier, the date the parties to the stockholders agreement we intend to enter into in connection with this offering cease to own in the aggregate 7.5% of the outstanding shares of Class A common stock, assuming the exchange of all Common Units), ***each share of Class A common stock held by a Principal Stockholder will entitle such Principal Stockholder to ten votes and each Principal Stockholder that holds Class B common stock will be entitled, without regard to the number of shares of Class B common stock held by such Principal Stockholder, to a number of votes equal to 10 times the aggregate number of Common Units (including Common Units issued upon conversion of vested Incentive Units (as defined herein)) of Bumble Holdings held by such Principal Stockholder.*** . . . The purpose of providing our Principal Stockholders with outsized voting rights, subject to a reasonable time-based sunset, is to promote the ability of our board of directors to execute our mission-first strategy by reducing, during Bumble's initial years as a public company, the board's exposure to pressure that might be brought by activist stockholders to focus on short-term objectives rather than our long-term strategy.

64.    The Prospectus further disclosed that:

After the completion of this offering, our Principal Stockholders will beneficially own a majority of the combined voting power of our Class A and Class B common stock. More specifically, upon completion of this offering our Founder will

beneficially own approximately 11% of the outstanding economic interests in Bumble and 16% of the combined voting power in Bumble Inc. (or 17% if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and Blackstone will beneficially own approximately 57% of the outstanding economic interests in Bumble and 80% of the outstanding voting power in Bumble Inc. (or 53% and 78% if the underwriters exercise in full their option to purchase additional shares of Class A common stock). ***Accordingly, the voting rights held by our Principal Stockholders are significantly in excess of their level of economic ownership. As a result, we will be a "controlled company" within the meaning of the Nasdaq corporate governance standards.*** . . .

65.     On February 16, 2021, Blackstone took Bumble public.  The IPO raised approximately $2.36 billion from investors in gross offering proceeds.

66.     As disclosed, after the IPO, Blackstone remained the controlling stockholder of Bumble with Defendant Herd at the helm.  In addition, under the terms of the Stockholders Agreement, Blackstone was entitled to designate ***six*** directors to the Bumble Board.

C.     <u>Bumble's Lackluster Performance After the IPO</u>

67.     Following its IPO, Bumble claimed it was experiencing significant growth in its paying user count, announcing that it had increased 32% year-over-year to 2.69 million by the end of the fourth quarter of fiscal 2020 (ended December 31, 2020), 30% year-over-year to 2.80 million by the end of the first quarter of 2021 ("1Q21") (ended March 31, 2021), and by another 20% year-over-year to 2.93 million by the end of the second quarter of 2021 ("2Q21") (ended June 30, 2021). As of June 30, 2021, Bumble reported having 42 million "average monthly users," 2.93 million of which were the all-important "paying users" who purchased Premium subscriptions (1.47 million on the Bumble app and 1.45 million on the Badoo app).  In the first and second quarter of 2021, Bumble added over 100,000 paying users each quarter.

68.     In reality, during the third quarter of 2021 ("3Q21") ending September 30, 2021, the Company's previously reported favorable paying user growth trend abruptly reversed.  Bumble actually ***lost*** over 60,000 paying users between its two apps.  Specifically, the 20-32% paying user

growth the Bumble app had been experiencing tapered off dramatically – growing only from 1.47 million paying users to 1.53 million paying users, or only about 4% – and the number of paying users on the Badoo app *declined* from 1.45 million paying users to 1.33 million paying users.

69.     The reasons for the declines were directly related to actions taken by Bumble. Specifically, Bumble had increased pricing on the Bumble app during 3Q21, reducing the number of users willing to pay for a Premium membership on the app.  As for the Badoo app, there was a temporary disabling of third-party payment options on Android by Bumble as it prepared to move payments to its platform, materially impacting the Company's paying user growth and revenue collection.  Demonstrating that these were Company-specific problems, Bumble's biggest competitor, Match.com, experienced substantial paid user growth during 3Q21, reporting its highest-ever net additions and growing its customer base by 1.3 million paying users.

**D.    Bumble's Secondary Public Offering**

70.     Despite the adverse facts about its financials, on September 7, 2021, Bumble filed with the SEC a Registration Statement on Form S-1 for a secondary public offering of 18,000,000 shares of Bumble Class A common stock with an offering price of $54.00 per share – a significant drop from its opening day closing price of $75.46 per share.  The Registration Statement was signed by Defendants Herd, Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, Thomas-Graham, and Chief Financial Officer ("CFO") Anuradha B. Subramanian ("Subramanian").  The SEC declared the Registration Statement effective on September 9, 2021, and on or about September 13, 2021, Bumble filed the final Prospectus for the SPO (collectively, the "SPO Registration Statement").

71.     The SPO Registration Statement claimed the Bumble app was "a leader in the online dating sector across several countries" with "approximately 1.4 million Bumble App Paying Users during the six months ended June 30, 2021."  The SPO Registration Statement also claimed

the Badoo app "continues to be a market leader" and "had approximately 1.5 million Badoo App

and Other Paying Users during the six months ended June 30, 2021," stating:

- The Bumble app, launched in 2014, is one of the first dating apps built with women at the center. On Bumble, women make the first move. ***Bumble is a leader in the online dating sector across several countries, including the United States, United Kingdom, Australia and Canada.*** We believe that because women feel more confident and empowered on our platform, they are more engaged than on other dating apps. As a result, we believe that Bumble has one of the highest percentages of women Paying Users among dating apps. According to OC&C Strategy Consultants LLP, UK ("OC&C"), within the North America freemium market, Bumble has approximately 30% more female users for every male user compared to the gender mix of users in the market who do not use Bumble. ***Additionally, according to OC&C, a higher percentage of Bumble's female users convert to payers than the market average. We had approximately 1.4 million Bumble App Paying Users during the six months ended June 30, 2021.***

- The Badoo app, founded by Andrey Andreev and launched in 2006, was one of the pioneers of web and mobile free-to-use dating products. Badoo's mantra of "Date Honestly" extends our focus on building meaningful connections to everyone. ***Badoo continues to be a market leader in Europe and Latin America*** and is diversified across geographies as a top three grossing iOS lifestyle app in 73 countries as of July 31, 2021. ***We had approximately 1.5 million Badoo App and Other Paying Users during the six months ended June 30, 2021.***

72.    The SPO Registration Statement also represented that Bumble's "total paying

users" had been materially growing leading up to the SPO.  For example, according to the SPO

Registration Statement, Bumble had 0.574 million paying users as of December 31, 2018, which

had grown to 0.856 million paying users as of December 31, 2019, and then to 1.14 million users

as of December 31, 2020, and to 1.41 million paying users as of June 30, 2021.  The SPO

Registration Statement also stated Bumble's individual paying user count for its Badoo app had

grown from 1.13 million paying users as of December 31, 2018, to 1.19 million paying users as of

December 31, 2019, and then to 1.36 million paying users as of December 31, 2020, and to 1.45

million paying users as of June 30, 2021.

73.    In the SPO Registration Statement, the Company continued to represent an ongoing, favorable paying user growth trajectory propelled by a "large, growing and engaged community":

> We have created a large, growing and engaged community with approximately 2.9 million average Total Paying Users as of June 30, 2021, *up 24.9% from June 30, 2020. The sheer scale of our platform creates powerful network effects, with more users on the platform improving selection, which improves user experience and drives even more users to our platform.*

74.    Concerning Bumble's "Growth Strategies," the SPO Registration Statement highlighted the Company's "Increasing Monetization" of its online dating apps, noting that while Bumble was "still early in [its] monetization journey," Bumble "expect[ed] to increase paying users and average revenue per paying user over time."

75.    Under the rules and regulations governing the preparation of the Registration Statement, the Individual Defendants were required to disclose the problems plaguing the Company's Bumble app and Badoo app and the resulting adverse impacts to the Company's paying user base.  Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's related interpretive releases, issuers are required to disclose events or uncertainties, including any "known trends," that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  At the time of the SPO, growth in Bumble's overall paying user count had declined significantly during 3Q21.  The adverse events and uncertainties associated with these declining paying user trends were reasonably likely to have a material impact on Bumble's financial condition and business prospects, and, therefore, were required to be disclosed in the SPO Registration Statement.

76.    The SPO took place on or about September 13, 2021, just before the September 30, 2021 end of Bumble's 3Q21. However, Bumble did not disclose the reversal of the paying user growth trends previously reported or problems plaguing its dating apps.

E.    **Blackstone's Windfall**

77.    Significantly, Bumble did not sell any shares of Class A common stock offered in the SPO and did not receive any of the resulting proceeds.  Instead, the SPO was undertaken solely to enable controlling stockholder Blackstone to sell 20.7 million shares of its Bumble Class A common stock at $54 per share, thereby generating more than $1.1 billion in gross proceeds for Blackstone.  According to the 2021 10-K, although "Bumble did not sell any shares of Class A common stock in the offering and did not receive any of the proceeds from the sale[,] Bumble paid the costs associated with the sale of shares by the Selling Stockholders, net of the underwriting discounts."[15]

78.    The Stockholders Agreement remained in place at the time of and after the SPO. As a result, Blackstone, along with Herd, retains control of Bumble, its voting power, and the composition of its Board.  In fact, as of April 11, 2022, Blackstone held 33.8% of Bumble Class A stock, as well as 18.3% of the Common Units, giving it 70.2% of the Company's voting power.[16] Reflecting its control over the Company, four Blackstone employees sit on Bumble's Board.

79.    Thus, Blackstone benefited heartily, at Bumble's expense, from the sale of its shares in the SPO, while maintaining full control over the Company.

F.    **Bumble Discloses Its True Financial Condition and Business Prospects**

80.    On November 10, 2021, Bumble announced its 3Q21 financial results.   The Company disclosed that, rather than continuing its growth trajectory, the Company's total paying

---

[15]    The costs totaled $29,160,000.  Blackstone Securities Partners L.P. purchased 1,020,000 shares at a $1.62 per share discount.

[16]    As of April 11, 2022, Defendant Herd had 33.3% ownership, or 22% combined voting power.

user count had actually declined to 2.86 million, well below the Company's 2.9 million reported paying users as of June 30, 2021 that was highlighted in the SPO Registration Statement.

81.     The price of Bumble Class A common stock declined substantially in response to this news.  By December 31, 2021, Bumble Class A common stock traded at $33.86 per share.  By January 27, 2022, Bumble Class A common stock traded below $27 per share, a decline of more than 50% from the SPO price.[17]  Bumble's performance is in sharp contrast to the S&P 500, which was up 24 percent on the year, and the Nasdaq, which rose 19 percent.[18]

82.     Notably, Blackstone held a significant ownership stake in ten companies that went public on the NY Stock Exchange or Nasdaq in 2021.  As of December 2021, half of those companies – including Bumble – were trading well below their offering prices.

### G.     The Individual Defendants, Among Others, Are Named As Defendants In A Securities Class Action Lawsuit

83.     On January 24, 2022, a securities class action captioned *UA Local 13 Pension Fund v. Bumble Inc. et al.*, No. 1:22-cv-00624, was filed in the United States District Court for the Southern District of New York (the "Securities Class Action") charging Bumble, all of the Individual Defendants, CFO Subramanian, and the underwriters for the SPO, including Blackstone, with violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77k, 77l(a)(2), and 77o, based on the alleged issuance of false and misleading statements of material fact and the alleged omission to state material facts necessary to make other statements made not misleading, in connection with Bumble's SPO.

---

[17]     *See* Yahoo Finance.

[18]     Josh Kosman, *Blackstone Gets Stuck with IPO Duds this Year Including Bumble and Oatly, The New York Post*, Dec. 24, 2021, https://nypost.com/2021/12/24/blackstone-stuck-with-ipo-duds-this-year-including-bumble-oatly/.

### H.    **Bumble's Materially False and Misleading Proxy Statement**

84.    On April 22, 2022, Bumble filed its 2022 Proxy Statement with the SEC.

85.    The 2022 Proxy contained false and misleading statements and omissions in violation of Section 14(a) of the Exchange Act.  The 2022 Proxy contains the following statements urging shareholders to vote to re-elect Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Bumble Board:

> Depth of experience, fitness and the ability to make meaningful contributions to our Board's oversight of the business and affairs of Bumble, in addition to a willingness to exercise independent judgment, and an impeccable reputation for honest and ethical conduct that aligns with our core values, are important factors when identifying prospective director candidates. Additionally, in identifying potential director candidates, our Board evaluates a candidate's time commitments to ensure the appropriate amount of time, energy and care is given to the needs of our business.
>
> \* \* \*
>
> Our Board seeks to ensure that it is composed of members whose particular experience, qualifications, attributes and skills, when taken together, will allow the Board to satisfy its oversight responsibilities effectively in light of Bumble's business, structure and risk.
>
> As specified in our Corporate Governance Guidelines, in identifying candidates for membership on the Board, the Nominating and Corporate Governance Committee takes into account (1) minimum individual qualifications, such as strength of character, mature judgment, familiarity with Bumble's business and industry, independence of thought and an ability to work collegially with the other members of the Board, and
>
> (2) all other factors it considers appropriate, which may include age, diversity of background, existing commitments to other businesses, potential conflicts of interest with other pursuits, legal considerations such as antitrust issues, corporate governance background, various and relevant career experience, relevant technical skills, relevant business or government acumen, financial and accounting background, technology background, compliance background, executive compensation background and the size, composition and combined expertise of the Board. While neither the Nominating and Corporate Governance Committee nor the Board has adopted a formal policy regarding diversity, they evaluate each candidate in the context of the Board's membership as a whole and seek to achieve a mix of members that represents a diversity of background and experience in order to promote the representation of diverse views on the Board.

86.     In regard to risk oversight, the 2022 Proxy stated, in part:

The Board has extensive involvement in the oversight of risk management related to us and our business and accomplishes this oversight through regular reporting by the Audit and Risk Committee. The Audit and Risk Committee represents the Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements and our enterprise risk management program. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit and Risk Committee reviews and discusses all significant areas of our business and summarizes for the Board all areas of risk and the appropriate mitigating factors.

87.     The 2022 Proxy represented that the Board was committed to strong corporate governance:

Our commitment to good corporate governance is reflected in our Corporate Governance Guidelines, which describe our Board of Directors' views and policies on a wide range of governance topics. These Corporate Governance Guidelines are reviewed from time to time by our Nominating and Corporate Governance Committee and, to the extent deemed appropriate in light of emerging practices, revised accordingly, upon recommendation to and approval by our Board of Directors.

88.     The 2022 Proxy detailed the Audit Committee's duties which include, assisting the Board in oversight over:

- The effectiveness of our control environment, including internal controls over financial reporting;

- Our compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

- The independent auditor's qualifications, performance and independence;

- The effectiveness of our risk management processes, particularly with respect to financial risk exposure;

- The performance of our internal audit function; and

- Our technology security and data privacy programs.

89.     Defendants' statements were false and misleading and omitted information. Contrary to the representations in the Proxy Statement: (i) the Board did not maintain adequate

compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks, and (ii) the Audit Committee did not adequately review the Company's financial statements and disclosures and monitored disclosure and internal controls to ensure they were effective.

90.     These false and misleading statements and omissions are an essential link in the re-election of Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Board.  As a result of the Directors' misleading statements in the 2022 Proxy, Bumble's stockholders risk re-electing Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Company's Board.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.     Plaintiff brings this action derivatively and for the benefit of Bumble to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Bumble, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

92.     Bumble is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.     Plaintiff is, and has been at all relevant times, a stockholder of Bumble and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of Bumble in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

94.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

A.    <u>**Demand Upon Defendant Herd Is Excused**</u>

95.    As admitted by Bumble in its public filings, Herd is the Company's CEO and therefore is not independent under Nasdaq listing rules.  Indeed, Bumble's Proxy Statement does not list Herd as an independent director.  As an employee, Herd derives substantial income from employment with Bumble, thus she could not consider a demand for action that might require her to sue the directors that control her employment and/or fellow members of management with whom she works on a day-to-day basis.

96.    Herd will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Herd's total compensation was $1,125,200 in 2021 and $19,687,045 in 2020.  As of April 11, 2022, Herd held 604,640 shares of Bumble Class A common stock and 25,000,871 Common Units, giving her 22% of the Company's voting control.  If Herd admitted that she, Bumble, or others engaged in misconduct, her investment in Bumble would be substantially devalued.  Further, if Herd acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as an executive, director, and major investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

97.    Herd is the Founder of the Company, and a controlling shareholder.  As a result, Herd would be interested in a demand regarding her own wrongdoing, and demand upon her is excused.

98.    Herd signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Herd is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

99.    Defendant Herd also signed the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

100.    Herd has long-standing business relationships with other directors that preclude her from acting in an independent and disinterested manner.  Indeed, in November 2021, Blackstone announced that it purchased a majority investment in Spanx, Inc., a womenswear brand, at a valuation of $1.2 billion.  Among the new investors in Spanx participating in the deal were Defendant Herd, and G9 Ventures, founded by Defendant Griffin, as well as Oprah Winfrey and Reese Witherspoon.[19]

101.    Defendant Herd has a financial relationship with Defendant Griffin as evidenced not only by their serving together on the Bumble Board, and investing together in Spanx, but also through Defendant Griffin's venture "Social Studies," which is backed by investors including Herd, as well as certain other co-investors in Spanx such as Oprah Winfrey and Reese Witherspoon.

102.    Herd also has a long-standing relationship with Defendant Mather, whom she has described as "a guiding light for me at personal and professional levels."[20]

103.    In addition, Herd and Blackstone have a contractual relationship pursuant to the Stockholders Agreement that further reflects her financial connections with Blackstone and lack of independence and disinterest with regard to the matters pled herein.

---

[19]    Blackstone Press Release, Nov. 18, 2021, https://www.blackstone.com/news/press/spanx-inc-and-blackstone-close-majority-sale-secure-new-investors-including-oprah-winfrey-reese-witherspoon-and-whitney-wolfe-herd/.

[20]    Emma Hinchliffe, *Bumble CEO Whitney Wolfe Herd Becomes the Youngest Woman to Take a Company Public, Fortune*, Feb 11, 2021, https://fortune.com/2021/02/11/bumble-ipo-ceo-whitney-wolfe-herd-bmbl-stock-shares-interview-app-initial-public-offering/.

104.     Herd, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Herd was required to investigate and take action to prevent damage to Bumble, and its stockholders.  Had Herd taken timely action, the damage caused to Bumble could have been prevented or minimized.

105.     Furthermore, Herd and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

106.     Herd is neither disinterested nor independent.  Any demand upon Defendant Herd is futile and, thus, excused.

**B.     <u>Demand Upon Defendant Anderson Is Excused</u>**

107.     Defendant Anderson has been a Bumble director since August 2020.

108.     Anderson will not sue those responsible for the wrongdoing pled herein because she is employed by Blackstone, Bumble's majority stockholder.  If Anderson acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

109.    Anderson signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Anderson is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

110.    Anderson authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

111.    Anderson has long-standing business relationships with several of the other directors that preclude her from acting in an independent and disinterested manner.  Anderson joined Blackstone in 2009.  At the time of the SPO, Anderson was a Senior Managing Director and the Global Head of Public Affairs and Marketing.  She is now a Senior Managing Director and Global Head of External Relations at Blackstone.  Defendants Bavishi, Korngold, and Morgan are also employed by Blackstone.

112.    Anderson, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Anderson was required to investigate and take action to prevent damage to Bumble, and its

stockholders.  Had Anderson taken timely action, the damage caused to Bumble could have been prevented or minimized.

113.    Furthermore, Anderson and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

114.    Anderson is neither disinterested nor independent.  Any demand upon Defendant Anderson is futile and, thus, excused.

### C.     **Demand Upon Defendant Atchison Is Excused**

115.    Defendant Atchison has been a Bumble director since October 2020.  She is the Chair of the Audit and Risk Committee.  Her total compensation for her service on the board was $75,000 in 2021 and $732,730 in 2020.  As of April 11, 2022, Atchison held 2,680 Common Units and 87,915 Incentive Units, of which 11,989 had vested.

116.    Atchison will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  If Atchison admitted that she, Bumble, or others engaged in misconduct, her investment in Bumble would be substantially devalued.  Further, if Atchison acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

117.    Atchison signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Atchison is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

118.    Atchison authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

119.    Atchison, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Atchison was required to investigate and take action to prevent damage to Bumble, and its stockholders.  Had Atchison taken timely action, the damage caused to Bumble could have been prevented or minimized.

120.    As Chair of the Audit and Risk Committee, Atchison had duties regarding oversight of the risks facing the Company and Bumble's compliance with relevant laws, rules, and regulations.  Atchison utterly failed to perform these essential duties.

121.    Furthermore, Atchison and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

122.    Atchison is neither disinterested nor independent.  Any demand upon Defendant Atchison is futile and, thus, excused.

**D.    <u>Demand Upon Defendant Bavishi Is Excused</u>**

123.    Defendant Bavishi has been a Bumble director since January 2020.

124.    Bavishi will not sue those responsible for the wrongdoing pled herein because he is employed by Blackstone, Bumble's majority stockholder.  If Bavishi acknowledged that executives at Bumble had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

125.    Bavishi signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Bavishi is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering him incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he is financially interested in the outcome.

126.    Bavishi authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

127.    Bavishi has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  Bavishi joined Blackstone in 2013.  At the time of the SPO, Bavishi was, and still is, a Managing Director in Blackstone's Private Equity Group.  Defendants Anderson, Korngold, and Morgan also were employed by Blackstone during the relevant time period.

128.    Bavishi, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor

the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Bavishi was required to investigate and take action to prevent damage to Bumble, and its stockholders. Had Bavishi taken timely action, the damage caused to Bumble could have been prevented or minimized.

129.    Furthermore, Bavishi and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

130.    Bavishi is neither disinterested nor independent. Any demand upon Defendant Bavishi is futile and, thus, excused.

### E.    Demand Upon Defendant Bromberg Is Excused

131.    Defendant Bromberg has been a Bumble director since July 2020. His total compensation for his service on the board was $75,000 in 2021 and $814,562 in 2020. As of April 11, 2022, Bromberg held 6,524 Common Units and 87,915 Incentive Units, of which 11,989 have vested.

132.    Bromberg will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. If Bromberg admitted that he, Bumble, or others engaged in misconduct, his investment in Bumble would be substantially devalued. Further, if Bromberg acknowledged that executives at Bumble had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

133.    Bromberg signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein. As such, Bromberg is a named defendant in the Securities Class Action alleging violations of the federal securities laws,

rendering him incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he is financially interested in the outcome.

134.    Bromberg authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

135.    Bromberg, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Bromberg was required to investigate and take action to prevent damage to Bumble, and its stockholders.  Had Bromberg taken timely action, the damage caused to Bumble could have been prevented or minimized.

136.    Furthermore, Bromberg and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

137.    Bromberg is neither disinterested nor independent.  Any demand upon Defendant Bromberg is futile and, thus, excused.

**F.    Demand Upon Defendant Griffin Is Excused**

138.    Defendant Griffin has been a Bumble director since February 2021.  Her total compensation for her service on the board was $1,226,002 in 2021 and $814,562 in 2020.  As of

April 11, 2022, Defendant Griffin held 152,700 shares of Class A common stock and 99,904 Incentive Units, of which none has vested.

139.    Griffin will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  If Griffin admitted that she, Bumble, or others engaged in misconduct, her investment in Bumble would be substantially devalued.  Further, if Griffin acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

140.    Griffin signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Griffin is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

141.    Griffin authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

142.    Griffin has long-standing business relationships with Blackstone and Defendant Herd that preclude her from acting in an independent and disinterested manner. For example, Blackstone led an acquisition of Spanx together with Griffin and Defendant Herd.[21]  In addition, Defendant Griffin's venture "Social Studies," is backed by investors including Defendant Herd.

---

[21]    Blackstone Press Release, Nov. 18, 2021, https://www.blackstone.com/news/press/spanx-inc-and-blackstone-close-majority-sale-secure-new-investors-including-oprah-winfrey-reese-witherspoon-and-whitney-wolfe-herd/.

143.    Griffin, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Griffin was required to investigate and take action to prevent damage to Bumble, and its stockholders.  Had Griffin taken timely action, the damage caused to Bumble could have been prevented or minimized.

144.    Furthermore, Griffin and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

145.    Griffin is neither disinterested nor independent.  Any demand upon Defendant Griffin is futile and, thus, excused.

### G.    Demand Upon Defendant Korngold Is Excused

146.    Defendant Korngold has been a Bumble director since January 2020.  Korngold is a member of the Compensation Committee.

147.    Korngold will not sue those responsible for the wrongdoing pled herein because he is employed by Blackstone, Bumble's majority stockholder.  If Korngold acknowledged that executives at Bumble had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

148.    Korngold signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Korngold is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering him incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because he is financially interested in the outcome.

149.    Korngold authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

150.    Korngold is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Bumble Board through the false and misleading statements and material omissions in the 2022 Proxy.

151.    Korngold has long-standing business relationships with several of the other directors which precludes him from acting in an independent and disinterested manner.  Korngold joined Blackstone in 2019.  At the time of the SPO, Korngold was, and still is, a senior managing director and global head of Blackstone's Growth Equities Business, which is focused on providing capital to companies seeking to manage the execution risks associated with high-growth environments.  Mr. Korngold is also a member of both the BXG Committee and Tactical Opportunities Investment Committee at Blackstone.  Defendants Anderson, Bavishi, and Morgan were also employed by Blackstone during the relevant time period.

152.    Korngold, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's

Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Korngold was required to investigate and take action to prevent damage to Bumble, and its stockholders. Had Korngold taken timely action, the damage caused to Bumble could have been prevented or minimized.

153.    Furthermore, Korngold and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

154.    Korngold is neither disinterested nor independent. Any demand upon Defendant Korngold is futile and, thus, excused.

### H.    Demand Upon Defendant Mather Is Excused

155.    Defendant Mather has been a director since March 2020. She is the Chairperson of the board and also serves as the Chair of the Nominating and Corporate Governance Committee. Her total compensation for her service on the board was $300,000 in 2021 and $1,421,814 in 2020. As of April 11, 2022, Mather held 52,197 Common Units.

156.    Mather will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. If Mather admitted that she, Bumble, or others engaged in misconduct, her investment in Bumble would be substantially devalued. Further, if Mather acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director and investor with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

157.    Mather signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Mather is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

158.    Mather authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

159.    Mather is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Bumble Board through the false and misleading statements and material omissions in the 2022 Proxy.

160.    Mather has long-standing ties to Herd, who has described Mather as "a guiding light for me at personal and professional levels."[22]

161.    Mather, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the

---

[22]    Emma Hinchliffe, *Bumble CEO Whitney Wolfe Herd Becomes the Youngest Woman to Take a Company Public, Fortune*, Feb 11, 2021, https://fortune.com/2021/02/11/bumble-ipo-ceo-whitney-wolfe-herd-bmbl-stock-shares-interview-app-initial-public-offering/.

Board's duties were being discharged in good faith and with the required diligence and due care. Mather was required to investigate and take action to prevent damage to Bumble, and its stockholders. Had Mather taken timely action, the damage caused to Bumble could have been prevented or minimized.

162.    As Chair of the Nominating and Corporate Governance Committee, Mather failed to uphold her additional obligations, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct, Corporate Governance Guidelines, and other related policies.

163.    Furthermore, Mather and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

164.    Mather is neither disinterested nor independent. Any demand upon Defendant Mather is futile and, thus, excused.

**I.    <u>Demand Upon Defendant Morgan Is Excused</u>**

165.    Defendant Morgan has been a Bumble director since February 2021. Morgan is a member of the Nominating and Corporate Governance Committee.

166.    Morgan will not sue those responsible for the wrongdoing pled herein because she is employed by Blackstone, Bumble's majority stockholder. If Morgan acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

167.    Morgan signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein. As such, Morgan is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering

her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

168.    Morgan authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

169.    Morgan is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Bumble Board through the false and misleading statements and material omissions in the 2022 Proxy.

170.    Morgan has long-standing business relationships with several of the other directors that preclude her from acting in an independent and disinterested manner.  Defendant Morgan joined Blackstone in November 2020.  At the time of the SPO, Defendant Morgan was, and still is, Global Head of Portfolio Transformation & Talent at Blackstone.  Defendants Anderson, Bavishi, and Korngold were also employed by Blackstone during the relevant time period.

171.    Morgan, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Morgan was required to investigate and take action to prevent damage to Bumble, and its

stockholders. Had Morgan taken timely action, the damage caused to Bumble could have been prevented or minimized.

172.    As a member of the Nominating and Corporate Governance Committee, Morgan failed to uphold her additional obligations, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct, Corporate Governance Guidelines, and other related policies.

173.    Furthermore, Morgan and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

174.    Morgan is neither disinterested nor independent.  Any demand upon Defendant Morgan is futile and, thus, excused.

**J.    Demand Upon Defendant Steele Is Excused**

175.    Defendant Steele has been a Bumble director since 2020.  She is Chair of the Compensation Committee, a member of the Audit and Risk Committee, and a member of the Nominating and Corporate Governance Committee.  Her total compensation for her service on the board was $75,000 in 2021 and $814,562 in 2020.  As of April 11, 2022, Steele held 9,125 shares of Class A common stock.

176.    Steele will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  If Steele admitted that she, Bumble, or others engaged in misconduct, her investment in Bumble would be substantially devalued.  Further, if Steele acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

177.    Steele signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Steele is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

178.    Steele authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

179.    Steele, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Steele was required to investigate and take action to prevent damage to Bumble, and its stockholders. Had Steele taken timely action, the damage caused to Bumble could have been prevented or minimized.

180.    As a member of the Audit and Risk Committee, Steele had duties regarding oversight of the risks facing the Company and Bumble's compliance with relevant laws, rules, and regulations.  Steele utterly failed to perform these essential duties.

181.    As a member of the Nominating and Corporate Governance Committee, Steele failed to uphold her additional obligations, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct, Corporate Governance Guidelines, and other related policies.

182.    Furthermore, Steele and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

183.    Steele is neither disinterested nor independent.  Any demand upon Defendant Steele is futile and, thus, excused.

**K.    Demand Upon Defendant Thomas-Graham Is Excused**

184.    Defendant Thomas-Graham has been a Bumble director since August 2020. Defendant Thomas-Graham is a member of the Compensation Committee and a member of the Audit and Risk Committee.  Her total compensation for her service on the board was $75,000 in 2021 and $709,671 in 2020.  As of April 11, 2022, she held 6,535 shares of Class A common stock and 5,886 Common Units.

185.    Thomas-Graham will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Further, if Thomas-Graham acknowledged that executives at Bumble had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director, either knew of the wrongdoing or should have known of the wrongdoing.

186.    Thomas-Graham signed the September 7, 2021 SPO Registration Statement containing false and misleading statements and material omissions alleged herein.  As such, Thomas-Graham is a named defendant in the Securities Class Action alleging violations of the federal securities laws, rendering her incapable of making an independent and disinterested

decision to institute and vigorously prosecute this action because she is financially interested in the outcome.

187.    Thomas-Graham authorized the 2022 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

188.    Thomas-Graham is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Bumble Board through the false and misleading statements and material omissions in the 2022 Proxy.

189.    Thomas-Graham, as a director of Bumble, was, and is, required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure the Company had proper and effective policies and procedures regarding its public statements as required by federal laws; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with their fiduciary duties, and the Company's Code of Conduct, Corporate Governance Guidelines, and committee charters; (3) implement and maintain effective internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) ensure the Board's duties were being discharged in good faith and with the required diligence and due care. Thomas-Graham was required to investigate and take action to prevent damage to Bumble, and its stockholders. Had Thomas-Graham taken timely action, the damage caused to Bumble could have been prevented or minimized.

190.    As a member of the Audit and Risk Committee, Thomas-Graham had duties regarding oversight of the risks facing the Company and Bumble's compliance with relevant laws, rules, and regulations.  Thomas-Graham utterly failed to perform these essential duties.

191.    Furthermore, Thomas-Graham and the other Individual Defendants are interested and lack independence because they caused the Company to enter into the SPO which was designed to enrich Blackstone, the Company's controlling stockholder.

192.    Thomas-Graham is neither disinterested nor independent.   Any demand upon Defendant Thomas-Graham is futile and, thus, excused.

**L.    Additional Factors Demonstrating Demand Futility**

193.    Bumble has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

194.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

195.    Publicly traded companies, such as Bumble, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Bumble's damages.

**COUNT I**

**Against the Individual Defendants for Violations
of Section 14(a) of the Exchange Act**

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

197.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegation or reliance upon any allegation or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

198.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

199.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

200.    The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that are contained in the 2022 Proxy.  The 2022 Proxy contains proposals to Bumble's shareholders urging them to re-elect Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Bumble Board.  The 2022 Proxy, however, misrepresented or failed to disclose material deficiencies in Bumble's risk management and internal controls that were known to the Individual Defendants when filed.

Bumble's 2022 Proxy misrepresented, among other things, that the Board had effective oversight practices and the Company maintained adequate internal controls.

201.    The misleading information contained in the 2022 Proxy is material to Bumble's shareholders in determining whether to elect Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Board.

202.    The material misstatements and omissions in the 2022 Proxy have damaged and will continue to damage the Company.

203.    Plaintiff, on behalf of Bumble, seeks relief for damages that have been and will be inflicted upon the Company arising from the misleading 2022 Proxy in connection with the improper election of certain members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of
### Fiduciary Duties

204.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

205.    The Individual Defendants owed and owe fiduciary duties to Bumble.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Bumble the highest obligation of good faith and loyalty in the administration of Bumble's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Bumble alleged herein.

206.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

207.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Bumble in a manner consistent with the duties imposed upon them by law.

208.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Bumble's affairs and in the use and preservation of Bumble's assets.

209.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Bumble has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving securities fraud class actions against Bumble.

210.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<u>**COUNT III**</u>

**Against the Individual Defendants for
Contribution and Indemnification**

211.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

212.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

213.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions.  Plaintiff, on behalf of the Company, seeks relief from the

Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting

214.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

215.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

216.    In committing the wrongful acts, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

217.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

218.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## COUNT V

### Against the Individual Defendants for Gross Mismanagement

219.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

53

220.    The Individual Defendants had a duty to the Company and its stockholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

221.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

222.    During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

a)    Declaring that Plaintiff may maintain this action on behalf of Bumble and that Plaintiff is an adequate representative;

b)    Declaring that the Individual Defendants have breached their fiduciary duties, as well as aided and abetted each other's breaches of fiduciary duties, were unjustly enriched, grossly mismanaged the Company, and violated the federal securities laws, as alleged herein;

c)    Directing the Individual Defendants, jointly and severally, to account for all losses and damages sustained by Bumble by reason of the acts and omissions complained of herein and finding that the Individual Defendants are liable to the Company for its damages;

d)    Requiring the Individual Defendants to remit to Bumble all their salaries and other compensation received for the periods when they breached their duties;

e)    Awarding extraordinary equitable and injunctive relief as permitted by law and/or equity against all Individual Defendants and in favor of the Company;

f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorney's, consultant's and expert's fees; and

g)    Granting such other and further relief as the Court deems just and proper under the circumstances.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  May 27, 2022                 **WEISSLAW LLP**

By:   <u>s/ David C. Katz</u>
David C. Katz
Leigh Smith
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY  10007
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
dkatz@weisslawllp.com
lsmith@weisslawllp.com
jrubin@weisslawllp.com

*Attorneys for Plaintiff*